## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## OCALA DIVISION

**MAHAMOUD ALLI,**

       **Plaintiff,**

**v.**                            **Case No.   5:20-cv-556-ACC-PRL**

**ROBERT GREEN,**

       **Defendant.**

_____

## ORDER

This cause comes before the Court on Defendant Robert Green's Motion for Summary Judgment (Doc. 24) on Plaintiff Mahamoud Alli's claims for civil rights violations. For the reasons stated below, Green's Motion for Summary Judgment will be granted.

## I.     INTRODUCTION

This case arises out of the arrest and tasering of Plaintiff Mahamoud Alli on November 17, 2016 by Defendant Deputy Robert Green of the Lake County Sheriff's Office. At the time, Deputy Green and other law enforcement officers were setting up a perimeter looking for a suspect who had committed an aggravated assault with a stolen vehicle and fled on foot. Plaintiff filed his Complaint against Deputy Green in his individual capacity asserting three federal claims under 42 U.S.C. § 1983 for an unlawful investigatory stop and false arrest in violation of the

Fourth and Fourteenth Amendments (Count I); excessive force (Count II); and malicious prosecution (Count III).[1] On April 1, 2022, Defendant Green filed a Motion for Summary Judgment (Doc. 24) on the civil rights claims based on qualified immunity. Plaintiff filed a Response on April 22, 2022 (Doc. 26), to which Defendant Green filed a Reply on May 6, 2022. (Doc. 27).

After carefully considering the parties' legal memoranda and evidentiary submissions, the Court determines that Defendant Green is entitled to qualified immunity, thus, summary judgment is due to be granted on Plaintiff's civil rights claims.

## II.    FACTS

During the early morning hours of November 17, 2016, Plaintiff Alli was working overnight as security at TNT Marine and Creative Auto Boutique, businesses owned by his cousin and located on a shared property. (Alli Dep., Doc. 24-1 at 10-11, 19-20, 24). Before 3:00 a.m. that night, Deputy Green was on patrol with Deputy Young and parked in Montverde Park talking, when Deputy Green noticed a maroon Dodge Durango pulling a white trailer that had no taillights. (Green Dep., Doc. 24-3 at 28). Believing the vehicle to be suspicious, Deputies Green and Young approached the Durango.[2] (*Id.*). The Durango turned on its headlights and

---

[1] Plaintiff's state law claims were previously dismissed without prejudice. (*See* Doc. 19).
[2] Deputy Green testified that he could not see who was driving the Durango. (Doc. 24-3 at 28).

took off, coming within a couple of feet of Deputy Young, nearly hitting him.[3] (*Id.* at 28-29). Deputy Young used the radio to alert other law enforcement officers about the Durango. (Doc. 24-3 at 15; Vilches Dep., Doc. 24-4 at 17; Walker Dep., Doc. 24-5 at 8). Deputy Green lost sight of the Durango and did not see it again that evening. (Doc. 24-3 at 30). About an hour before Plaintiff's arrest, at around 2:45 a.m., Plaintiff was parked in his car and saw fifteen to eighteen law enforcement vehicles "running sirens" and "flying down" Highway 50 with their lights on, speeding one behind the other, with a sense of urgency. (Doc. 24-1 at 25-27). Down a side street, Johns Lake Street, Plaintiff saw an additional four or five law enforcement vehicles pass him. (*Id.*).

Deputy Walker spotted the Durango and pursued the vehicle for five to seven minutes, ultimately finding it stopped and with no occupants inside the vehicle; he believed that the suspect had bailed out of the vehicle and had run into the tree line. (Doc. 24-5 at 8-9, 15). The suspect abandoned the Durango a few hundred yards away from the fence surrounding Creative Auto-TNT Marine's location, and he was later apprehended in the subdivision "just north of Deputy Green's incident location." (Doc. 23-4 at 15; Doc. 24-5 at 11). Although Deputy Walker was following right behind the stolen Durango, and it only took him four to five seconds

---

[3] Deputy Green argues that he had probable cause to believe that the Durango driver had committed aggravated assault with a motor vehicle on a law enforcement officer. (Doc. 24-3 at 29; Doc. 24-4 at 16-17). Plaintiff does not dispute this point.

to approach it once it came to a stop near a "thick brushy wooded area," he did not know the direction in which the suspect fled on foot at the time, but he believed it was possible the suspect could have made it to the fence line of Creative Auto-TNT Marine and Deputy Green's location.[4] (Doc. 24-5 at 16-17; Doc. 26-1 at 4 ("Subj[ect] bailed on foot. . . somewhere in the woods."). There was a "cell phone going off just inside the wood[s]," believed to belong to the suspect, as one of the officers on the scene reported. (Doc. 26-1 at 4).

About thirty minutes after Deputy Green first saw the Durango nearly hit Deputy Young, Green arrived at the location near where the driver of the Durango had fled from the vehicle; Green took a perimeter position, although he did not know exactly where the driver had fled. (Doc. 24-3 at 14-16, 30). Deputy Green worked for the Lake County Sheriff's Office but was usually assigned to patrol in the City of Mineola, an area about seven miles away.[5] (Doc. 24-4 at 20). Green had only been on his own for a couple months. (*Id*. at 21). Typically, deputies are instructed to challenge vehicles inside of a perimeter location because they do not know if the suspects for whom they are looking stole a vehicle or are hiding out in a vehicle that is leaving the area or if they have contacted a vehicle to come get them out of the area where law enforcement is actively looking for them; there is also a greater sense

---

[4] The end location for the abandoned Durango was near the intersection of Lake Boulevard and State Road 50 "just beyond" Creative Auto Boutique. (Doc. 24-5 at 15).

[5] The Court may take judicial notice of facts that are generally known within its jurisdiction or in the public records. *Osheroff v Humana Inc*., 776 F.3d 805, 811 (11th Cir. 2015).

of urgency when it comes to locating suspects that have "bailed out" of vehicles. (*Id.* at 21-22).

Deputy Green's perimeter position was located on the west side of Lake Drive, and deputies were attempting to "box in" and find the suspect fleeing from the Durango. (Doc. 24-3 at 13). Deputy Green knew that the Durango and trailer had been stolen, and drugs and a gun had been found when other deputies searched the Durango. (*Id.* at 12, 33). The nearest officers to Green's location were within "shouting distance," but he could not see them. (*Id.* at 30-31). In a dangerous situation, Deputy Green estimated it would have taken "a couple of minutes" for another officer to get to him. (*Id.* at 31).

Between approximately 3:30 a.m. and 3:45 a.m., Plaintiff was in his vehicle parked at TNT Marine-Creative Auto Boutique's shared location on the outside perimeter of the two fences that surround the three-acre property. (Doc. 24-1 at 24-25). He was on the property line, backed up in the middle of the two gates, one in the back and one in the front, in order to let the tow truck drivers in. (*Id.*). Plaintiff would usually flash his lights at the passing police cars to show he "was alert" and "there for security"; his SUV was "marked" with the logos of his audio company ("Alphard Sound Technology"), but it was not marked as "security." (*Id.* at 25, 27-28 Doc. 24-2; Doc. 26-3). Plaintiff wore a badge on a lanyard that said private security because he held a private security license from the state of Florida. (*Id.* at

29). Plaintiff's license on the lanyard around his neck and his security shirt were covered by a black hoodie that he was wearing because it was cold; therefore, nothing externally visible identified him as a security officer that night. (*Id.* at 30-31; Doc. 24-3 at 38).

Deputy Green was in the patrol car by himself when Plaintiff flashed his lights to acknowledge him. (Doc. 24-1 at 24, 31). Green drove past Plaintiff, then stopped about five or six cars away from him. (*Id.* at 26). Green exited his car to approach Plaintiff. (*Id.* at 31). It was dark at that time of night (early morning) and the area where Plaintiff had parked was not well-illuminated because there were no streetlights or business lights on. (*Id.* at 31-32; Doc. 24-3 at 30; Doc. 24-4 at 18).[6] Deputy Green could not see the inside of Plaintiff's vehicle as he approached from the front and made his way to the driver's door, which had the window rolled down. (Doc. 24-3 at 32). Deputy Green did not know whether the person in Plaintiff's vehicle was the same suspect who had tried to hit a fellow deputy and fled from the Durango, and was then trying to steal another vehicle. (*Id.* at 12, 16).

Deputy Green pulled his gun from his waist and approached Plaintiff's driver's door with the gun pointed at Plaintiff's vehicle. (Doc. 24-1 at 26). It is

---

[6] Plaintiff disputes the level of illumination because, he argues, he had his headlights on. However, he testified that Green approached his vehicle from the front and the headlights would have illuminated to the forefront, but not necessarily the person *behind* the headlights and inside the vehicle.

undisputed[7] that Green told Plaintiff to exit his vehicle and show his identification. (*Id.* at 32; Doc. 24-3 at 12, 33; Doc. 24-6).[8] It took Deputy Green about one minute to exit his vehicle and approach Plaintiff's vehicle; he was cursing: "Get the F out of your truck," keeping the gun pointed at Plaintiff. (Doc. 24-1 at 26, 31-32). After Green told Plaintiff to "get the F out of the vehicle," he grabbed Plaintiff by the hoodie and tried to pull him out of the SUV. (*Id.* at 32).[9] Plaintiff cursed at him in response: "I'm F'ing security," and "I'm on duty for TNT Marine." (Doc. 24-1 at 33, 35). Green holstered his gun after Plaintiff told him that he was security. (Doc. 24-1 at 35; Doc. 24-3 at 12). Plaintiff kept his hands on the steering wheel up until Green holstered his gun. (Doc. 24-1 at 33; Doc. 24-3 at 12).

It is undisputed that Deputy Green repeatedly told Plaintiff to get out of the vehicle while approaching Plaintiff's SUV. (Doc. 24-1 at 31-32; Doc. 24-3 at 12, 33). Plaintiff was resting his right knee (which had previously suffered an injury years before) on the passenger seat.[10] (Doc. 24-1 at 38). Plaintiff admits that he was

---

[7] Plaintiff states in his Response that "he was trying to show Deputy Green his security identification because Deputy Green told Mr. Alli to show him his identification." (Doc. 26 at 5 ¶ 1).

[8] Deputy Green testified that Plaintiff told him that "he didn't have to show [him] anything because everyone knows who he [is]." (Doc. 24-3 at 11). However, Green had "no idea" whether Plaintiff was the suspect or a person being unreasonable within the perimeter. (*Id.* at 38). He was new and did not normally patrol in the area. (Doc. 24-4 at 20-21).

[9] Deputy Green testified that Plaintiff repeatedly failed to show his identification, was belligerent, and told him to "fuck off" multiple times; Plaintiff said that he did not have to show him anything, even though Deputy Green "tried to explain the situation to him." (Doc. 24-3 at 11-12, 17; Doc. 24-6 at 6; Doc. 24-7 (Use of Force Report)).

[10] Plaintiff also testified (somewhat inconsistently) that *both* of his legs were over the (center) console. (Doc. 24-1 at 38). It is unclear how his torso would then be facing straight ahead

moving around inside the vehicle because he was in the process of lifting his injured right knee with his hands over the console to the driver's cockpit area and onto the floor so he could exit the SUV "right when [Green] laid his hands" on Plaintiff through the window. (*Id*. at 38-39). Green "didn't give [Plaintiff] a chance. He tried to pull [his] head through . . . the window." (*Id.* at 33, 36, 39-40). After Green grabbed Plaintiff through the window, he let go of him. (*Id.*).[11]

Once Deputy Green holstered his gun, Plaintiff told Green that he was "gonna show him [his security] badge" which was around his neck; Plaintiff moved his hands from the steering wheel to pull his security badge out from under his hoodie to show Green. (*Id*. at 34-35). Green had not told Plaintiff that he could pull out the badge and had instead told him to get out of the truck. (*Id.*).

Deputy Green fired his taser, hitting Plaintiff in the left bicep and on the left side of the chest (Doc. 24-1 at 41; Doc. 24-3 at 11; Doc. 24-6 (Arrest Affidavit)). Then Deputy Green pulled Plaintiff out of his vehicle through the door, assisted by two other police officers, one of whom opened the door, while Green pulled Plaintiff

---

rather than to the right side. This inconsistency is unimportant in that Plaintiff concedes that he was still in the process of moving at least one leg at the point when Green reached Plaintiff's truck.

[11] Deputy Green wrote in the Arrest Affidavit that Plaintiff refused to step out of the vehicle and show his hands in response to Green's verbal commands. (Doc. 24-6). Green "grabbed [him] to get him out of the vehicle to which he shifted his weight" and Green "was unable to detain him." (*Id.*). Lake County Sheriff's Deputies did not have body cameras at the time of the incident. (Doc. 26-9 at 5). At that point, Deputy Green believed that he had probable cause for Plaintiff's commission of the crime of resisting without violence. (Doc. 24-3 at 34-35). Deputy Green's actions were subsequently determined to be within policy. (Doc. 24-7, Use of Force Report).

out and put him on the ground. (Doc. 24-1 at 41-42; Doc. 24-3 at 25-26). When Plaintiff was pulled out, he landed on his knee and his stomach. (Doc. 24-1 at 42-43). Deputy Green put his knee on Plaintiff's back around the neck and head area to hold Plaintiff down.[12] (*Id.* at 43). Plaintiff was placed in handcuffs and taken into custody. (Doc. 24-3 at 25-26; Doc. 24-6). After Deputy Green had Plaintiff in his custody, he made a call for emergency medical services, but Plaintiff refused treatment. (Doc. 24-3 at 34). The pain in Plaintiff's knee went away two days after his arrest. (Doc. 24-1 at 44). Plaintiff was treated for infection in the taser sites with some ointment. (*Id.* at 45).[13]

Plaintiff was charged with Resisting Law Enforcement Officer Without Violence. (Doc. 24-1 at 49-50; Doc. 26-5; Doc. 24-6). On January 10, 2017, the state attorney's office filed a Criminal Information against Plaintiff. (Doc. 26-5). The state attorney's office filed a Nolle Prosequi dropping the charges on February 16, 2017. (Doc. 26-6).

On November 13, 2020, Plaintiff filed suit against Deputy Green in this Court, alleging civil rights violations for false arrest and unreasonable seizure in violation

---

[12] Plaintiff testified that a second officer (who Plaintiff could not identify) also placed his knee on Plaintiff's back. (Doc. 24-1 at 44). Green testified that two other officers heard Green giving Plaintiff commands to show his identification and his hands but did not assist him pulling Plaintiff from the vehicle or handcuffing him because they arrived after Green already had Plaintiff out of the vehicle. (Doc. 24-3 at 26). Plaintiff has only sued Deputy Green.

[13] Plaintiff did not see a mental health professional as a result of this interaction with Deputy Green until 2019; his mental health has improved since then. (Doc. 24-1 at 62-63).

of the Fourth and Fourteenth Amendments (Count I); excessive force (Count II); and malicious prosecution (Count III). (Doc. 1). Plaintiff's state law claims for false imprisonment, battery, and intentional infliction of emotional distress were dismissed without prejudice on November 15, 2021, when the Court declined to exercise jurisdiction over them under 28 U.S.C. § 1367. (*See* Doc. 19).[14]

## III.   SUMMARY JUDGMENT STANDARD

Granting a motion for summary judgment is proper if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). Once the moving party meets this burden, "[t]he burden then shifts to the non-moving party, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact exists." *Porter v. Ray*, 461 F.3d 1315, 1320 (11th Cir. 2006) (citing *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115–17 (11th Cir. 1993)). Substantive law determines the materiality of facts, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248; *see also McCormick v. City of Ft. Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003)

---

[14] On October 1, 2021, the case was reassigned to the undersigned. (Doc. 16).

("The mere existence of some factual dispute will not defeat summary judgment unless the factual dispute is material to an issue affecting the outcome of the case.").

In determining if Deputy Green is entitled to summary judgment based on qualified immunity, the Court is to "resolve all issues of material fact in favor of the plaintiff." *Oliver v. Fiorino*, 586 F.3d 898, 901 (11th Cir. 2009). However, "[a]t the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007). "A court need not permit a case to go to a jury . . . when the inferences that are drawn from the evidence, and upon which the non-movant relies, are 'implausible.'" *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 743 (11th Cir. 1996); *see Scott*, 550 U.S. at 380 ("When the moving party has carried its burden . . . , its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.").

## III.   ANALYSIS

Plaintiff Alli claims that Deputy Green violated his Fourth and Fourteenth Amendment rights by unreasonably detaining, falsely arresting, and maliciously prosecuting him, and by violating his right to be free from the use of excessive force in the course of the arrest. (Doc. 1). The Court takes up the issue of qualified

immunity first. If Deputy Green is entitled to qualified immunity, then Plaintiff cannot prevail on his civil rights claims for false arrest and unreasonable seizure, excessive force, and malicious prosecution against Deputy Green.

## A. *Qualified Immunity*

The Fourth Amendment provides: "The right of the people to be secure in their persons . . . against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. It is clearly established that an arrest made without probable cause violates the Fourth Amendment. *Valderrama v. Rousseau*, 780 F.3d 1108, 1113 (11th Cir. 2015). An officer's seizure of a person is warranted if there is probable cause to do so. *Id.* "Probable cause exists when the facts and circumstances within the officer's knowledge, of which he or she has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Wilkerson v. Seymour*, 736 F.3d 974, 978 (11th Cir. 2013); *Brown v. City of Huntsville*, 608 F.3d 724, 734 (11th Cir. 2010). "Although probable cause requires more than suspicion, it does not require convincing proof, and need not reach the same standard of conclusiveness and probability as the facts necessary to support a conviction." *Lee v. Ferraro*, 284 F.3d 1188, 1195 (11th Cir. 2002) (citation omitted). "In determining whether probable cause exists, we deal with probabilities which are the factual and practical considerations of everyday life on which reasonable and prudent men, not

legal technicians, act." *Rankin v. Evans*, 133 F.3d 1425, 1435 (11th Cir. 1998) (quotations and alterations omitted). "[T]he standard for determining whether probable cause exists is the same under Florida and federal law." *Id.*

Section 1983 provides a cause of action for individuals to seek redress for constitutional violations committed by a defendant while acting under color of state law. 42 U.S.C. § 1983. Acts performed by law enforcement officers are considered performed under color of state law. *West v. Atkins*, 487 U.S. 49, 49–50 (1988). To avoid individual liability, a defendant may invoke the defense of qualified immunity. The doctrine of qualified immunity "offers complete protection for government officials sued in their individual capacities if their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Vinyard v. Wilson,* 311 F.3d 1340, 1346 (11th Cir. 2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Since the purpose of the doctrine is to "allow government officials to carry out their discretionary duties without fear of personal liability," *Steen v. City of Pensacola,* 809 F. Supp. 2d 1342, 1348 (N.D. Fla. 2011), qualified immunity protects all government actors except the plainly incompetent and those who knowingly violate federal law. *Lee,* 284 F.3d at 1194; *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (citation omitted). "'[G]overnment officials are not required to err on the side of caution,' [and] qualified immunity is appropriate in close cases where a reasonable officer could have believed that his actions were

lawful." *Lee*, 284 F.3d at 1200 (quotation omitted).

In resolving the matter of qualified immunity, the Court employs a multi-step, burden-shifting analysis. As an initial matter, the public official must "prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." *Penley v. Eslinger*, 605 F.3d 843, 849 (11th Cir. 2010) (quoting *Lee*, 284 F.3d at 1194). To deny qualified immunity, a plaintiff must prove that "an official's conduct violates 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Rioux v. City of Atlanta*, 520 F.3d 1269, 1282 (11th Cir. 2008) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

Thus, the first question is whether the facts, viewed in the light most favorable to Plaintiff, demonstrate that Deputy Green's conduct violated Plaintiff's constitutional rights. *See Pearson v. Callahan*, 555 U.S. 223, 232 (2009). If there was no violation, the inquiry ends and Deputy Green is entitled to qualified immunity; if there was a violation, then the next inquiry is whether the violated right was clearly established at the time of the violation. *See id.; see also Brown v. City of Huntsville*, 608 F.3d 724, 734 (11th Cir. 2010). The order in which the Court addresses these two inquiries is of no consequence. *Brown*, 608 F.3d at 734 (citing *Pearson*, 555 U.S. at 223, 236).

When determining whether a constitutional right was "clearly established," a court's inquiry is limited to the law at the time of the incident, as "an official could not reasonably be expected to anticipate subsequent legal developments." *Harlow*, 457 U.S. at 818. A plaintiff can show that a constitutional right was clearly established in three different ways: "(1) case law with indistinguishable facts clearly establishing the constitutional right; (2) a broad statement of principle within the Constitution, statute, or case law that clearly establishes a constitutional right; or (3) conduct so egregious that a constitutional right was clearly violated, even in the total absence of case law." *Lewis v. City of W. Palm Beach*, 561 F.3d 1288, 1291-92 (11th Cir. 2009) (citations omitted).

Although the Eleventh Circuit has recognized that options (2) and (3) can suffice, the Supreme Court has warned not to "define clearly established law at a high level of generality," and these are rarely invoked. *Crocker v. Beatty*, 995 F.3d 1232, 1240 (11th Cir. 2021) (citing *Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014); *Gaines v. Wardynski*, 871 F.3d 1203, 1209 (11th Cir. 2017)). "[I]f a plaintiff relies on a general rule, it must be obvious that the general rule applies to the specific situation in question" or "with obvious clarity to the circumstances." *Youmans v. Gagnon*, 626 F.3d 557, 563 (11th Cir. 2010); *Crocker*, 995 F.3d at 1240.

**B.** *Under Color of Law*

The Court now turns to the initial assessment in the qualified immunity analysis. Section 1983 provides a cause of action for individuals to seek redress for constitutional violations committed by a defendant while acting "under color of state law." 42 U.S.C. § 1983. "[T]o prevail on a civil rights action under § 1983, a plaintiff must show that he or she was deprived of a federal right by a person acting under color of state law." *Griffin v. City of Opa–Locka*, 261 F.3d 1295, 1303 (11th Cir. 2001).

Plaintiff Alli argues that "Green was not performing any discretionary function [for] which he is entitled to any claim of sovereign immunity." (Doc. 26 at 9). He argues that "this is a contested fact" and "[i]t was not a discretionary function for Green to unlawfully seize the Plaintiff [and] then use excessive force by tasing and slamming him on the [ground] when Plaintiff clearly was not the suspect." (*Id.*) Plaintiff "disputes that Green's discretionary duties would allow him to approach an innocent bystander on private property[15] [who was] working and unlawfully seize [him] at gunpoint then start giving [] unlawful commands for no reason." (*Id.* at 10). He argues: "Green knew that Plaintiff was not the suspect because he had encountered the suspect earlier" that night and "the suspect was described" on the

---

[15]  Deputy Green testified that Plaintiff's vehicle was actually in the easement near the road. (Doc. 24-3 at 16, 39).

police radio as "a white male" driving a red Durango, even before Green encountered Plaintiff who, he argues, did not fit the suspect's description and was driving a different vehicle. Plaintiff also argues that Green's lack of communication over the radio about the confrontation with Plaintiff and lack of request for immediate assistance from other officers means it is disputed whether Green was acting "within the scope of his discretionary authority." (*Id*. at 11).[16] However, Plaintiff fails to cite the correct test applied by federal courts to assess whether a law enforcement officer was acting "under color of law."

Acts performed by law enforcement officers while on duty are generally considered as performed "under color of law." *West v. Atkins*, 487 U.S. 49, 49–50 (1988); *Stephens v. DeGiovanni*, 852 F.3d 1298, 1314 (11th Cir. 2017) ("A person acts under color of state law when he acts with authority possessed by virtue of his employment with the state."). "A defendant acts under color of state law when she deprives the plaintiff of a right through the exercise of authority that she has by virtue of her government office or position." *Butler v. Sheriff of Palm Beach Cnty.*, 685 F.3d 1261, 1265-66 (11th Cir. 2012). "The dispositive question is whether the defendant was exercising the power [he] possessed based on state authority or was

---

[16] To the extent Plaintiff argues that because "Green's actions were intentional[,] he should not be granted qualified immunity" in his section on discretionary authority, the argument is misplaced. (Doc. 26 at 11). Actions taken within a government employee's discretionary authority are usually "intentional" and not determinative of whether qualified immunity should be denied; instead, the Court applies the analysis for qualified immunity discussed at length below. *See e.g.*, *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002).

acting only as a private individual." *Id.* at 1266.

Deputy Green contends that he was on duty, in uniform, in pursuit of a dangerous suspect who had left the Durango on foot, and Green was stationed to enforce the perimeter as part of the manhunt for that suspect. (Doc. 24). He further argues that investigating crimes, arresting suspects, and enforcing the law are the very purpose of law enforcement and meet the standard of acting within discretionary authority as set forth in Eleventh Circuit decisions involving law enforcement officers. (Doc. 27 at 4).

"A person acts under color of state law when he acts with authority possessed by virtue of his employment with the state," or when "the manner of his conduct . . . makes clear that he was asserting the authority granted him and not acting in the role of a private person." *Griffin*, 261 F.3d at 1329-30 (citations omitted). "'A government official acts within [his] discretionary authority if the actions were (1) undertaken pursuant to the performance of [his] duties and (2) within the scope of [his] authority.'" *Jones v. City of Atlanta*, 192 F. App'x 894, 897 (11th Cir. 2006) (per curiam)[17] (quoting *Lenz v. Winburn*, 51 F.3d 1540, 1545 (11th Cir. 1995)). Making an arrest is thus a discretionary function for a police officer. *See Crosby v. Monroe Cnty.*, 394 F.3d 1328, 1332 (11th Cir. 2004); *see also Lee*, 284 F.3d at 1194

---

[17] Unpublished opinions of the Eleventh Circuit constitute persuasive, and not binding, authority. *See* 11th Cir. R. 36-2 and I.O.P. 6.

(finding that "there can be no doubt that [the officer] was acting in his discretionary capacity when he arrested [the plaintiff]," even though the plaintiff asserted that the officer used excessive force in the manner in which she was arrested). The narrow scope of acts by state employees that are generally not considered "acts under color of law" include conduct by officers "in the ambit of their personal pursuits." *See Myers v. Bowman*, 713 F.3d 1319, 1329 (11th Cir. 2013) (holding that county judge was not acting under color of law when he reported to police that "someone" had stolen his daughter's dog in dispute with her ex-fiancé, and then threatened him once arrested); *Butler v. Sheriff of Palm Beach Cnty.*, 685 F.3d 1261 (11th Cir. 2012) (holding female county corrections officer was acting as an "angry parent" and not under color of law when, surprised to find her teenaged daughter in bed with a young man, she punched him, threatened to shoot him with her service weapon, and handcuffed him); *Almand v. DeKalb Cnty., Ga.*, 103 F.3d 1510, 1515 (11th Cir. 1997) (police officer who returned to woman's apartment and broke in to rape her was not acting under color of law but acted as "any other ruffian" in his capacity as a private citizen); *Hickman v. Johnson*, No. 6:18-cv-218-22LHP (M.D. Fla. Sept. 24, 2018) (slip op.) (Conway, J.) (citing cases of officers engaged in "horseplay" with weapons that injured family and fellow officers which were not considered acts "under color of law"). In this case, Deputy Green's investigative detention and arrest of Plaintiff fell squarely within his discretionary duties of serving as a law

enforcement officer. Moreover, Plaintiff does not dispute[18] that Green was on-duty and working as a law enforcement officer with the Lake County Sheriff's Office at the time of the incident. The Court now turns to the two-pronged qualified immunity analysis.

### C. "*Unreasonable Seizure,*" *False Arrest and Malicious Prosecution*

Deputy Green argues first that he is entitled to qualified immunity on Plaintiff's claims that Green violated his Fourth Amendment right to be free of "unreasonable seizure" and false arrest. (Doc. 1 (Count I)). Plaintiff argues that the evidence in the record contradicts Deputy Green's argument that arguable probable cause existed to support the arrest. Plaintiff maintains that there was no probable cause to detain and arrest him because Green knew he was not the suspect from the Durango, having seen him about an hour before.

"For Fourth Amendment purposes, a seizure occurs when an officer, 'by means of physical force or show of authority, has in some way restrained the liberty of a citizen.'" *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968). "An encounter between a police officer and a citizen becomes a seizure when 'a reasonable person would not feel free to terminate the encounter.'" *United States v. Jordan*, 635 F.3d 1181, 1186

---

[18] *See* Plaintiff's Response, Doc. 26 ("Robert Green was employed by the Lake County Sheriff's Office as a law enforcement officer.").

(11th Cir. 2011). The Court turns to the threshold question of whether the facts alleged show the officer's conduct violated a constitutional right.

### 1. Investigatory *Terry* Stop

"Under the Fourth Amendment, a police officer generally may lawfully detain an individual without a warrant if . . . there is reasonable suspicion to believe the individual has engaged or is about to engage in criminal activity" and it is "an investigative or *Terry* stop." *United States v. Gibbs*, 917 F.3d 1289, 1294 (11th Cir. 2019). Generally, when a police officer detains a person, the officer must justify the particular intrusion by pointing to "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry*, 392 U.S. at 16. The *Terry* standard of reasonable suspicion "entails some minimal level of objective justification for making a stop—that is, something more than an inchoate and unparticularized suspicion or 'hunch,' but less than the level of suspicion required for probable cause." *United States v. Sokolow*, 490 U.S. 1, 2 (1989). "'[R]easonable suspicion' is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence." *Illinois v. Wardlow*, 528 U.S. 119, 123–24 (2000).

In determining whether reasonable suspicion exists, a court considers "the totality of the circumstances from the perspective of a reasonable officer." *United States v. McCoy*, 259 F. App'x 264, 268 (11th Cir. 2007). "A law enforcement

official who reasonably but mistakenly concludes that reasonable suspicion is present is still entitled to qualified immunity." *Jackson v. Sauls*, 206 F.3d 1156, 1166 (11th Cir. 2000). "When an officer asserts qualified immunity, the issue is not whether reasonable suspicion existed in fact, but whether the officer had 'arguable' reasonable suspicion to support an investigatory stop." *Id.* (citations omitted).

Deputy Green argues that the totality of the circumstances in this case establish he had arguable reasonable suspicion to conduct an investigatory stop and brief detainment of Plaintiff, who was within the "perimeter" of the manhunt for the suspect who fled the Durango on foot, not far from Plaintiff's parked SUV. (Doc. 24 at 14). Green argues that no one knew where the suspect had fled, and deputies had set up a perimeter to find the suspect and box him in, with Green stationed by himself in an area that was not well-lit at 3:45 a.m. (*Id.*). Green saw Plaintiff when he flashed his lights, and Plaintiff does not dispute that his vehicle was not marked as a security vehicle, he was not wearing anything externally that identified him as a security guard, and the situation was "urgent" during the middle-of-the-night manhunt, with fifteen to eighteen law enforcement vehicles running sirens and "flying down the street." Deputy Green argues that deputies are instructed to "challenge" vehicles inside of a perimeter during a manhunt. Deputy Green did not know if the suspect had stolen another vehicle, was hiding in another vehicle, or had contacted a third party (using his cell phone) to pick him up to evade law enforcement. Green argues

that a reasonable law enforcement officer could have reasonably questioned Plaintiff's presence within the perimeter—given that Plaintiff's vehicle was not marked as security and he had just flashed his headlights—and demanded that Plaintiff identify himself.

Plaintiff responds that Deputy Green's actions in initially detaining Plaintiff "had nothing to do with the pursuit of the suspect" from the Durango because Plaintiff did not fit the physical description of the suspect—he describes himself as a "dark skin Indian male" (Doc. 26 at 4-5, 11), he was not in the same type of vehicle as the suspect, and Green was not in active pursuit of the suspect—a different officer was (Deputy Walker). Plaintiff also argues that Deputy Green's initial detention of Plaintiff was not reasonable because he never called in his actions over the radio to let his fellow officers know that he had potentially found the suspect because Deputy Green already knew—or would have immediately learned from other officers—that Plaintiff did not fit the suspect's description. He argues that Deputy Green "went rogue" and confronted Plaintiff by himself without any backup and only belatedly called in to report that he had tased Plaintiff after the confrontation.

In this case, the issue is whether Green's investigatory detention of Plaintiff and demand for Plaintiff to show identification was unreasonable under the circumstances. "[A] *Terry* stop must be justified at its inception, and . . . reasonably related in scope to the circumstances which justified the interference in the first

place." *Hiibel v. Sixth Judicial Dist. Court of Nevada*, 542 U.S. 177, 186 (2004). Here, the totality of the circumstances established reasonable suspicion within the perimeter of the urgent manhunt sufficient for Deputy Green to briefly detain Plaintiff and ask him for identification.

Deputy Green had previously witnessed the Durango veer towards Deputy Young and drive away, but he did not see the driver and either did not hear the description of the driver on the radio or ascribe the description unequivocal weight.[19] Green knew that the Durango had been chased by another deputy (Walker), that the driver had abandoned the vehicle because the tires had blown out (from the stop sticks), and the driver had fled on foot; Green was part of the group of law enforcement officers who created the perimeter at approximately 3:00-3:45 a.m. to "box in" the driver on foot. Green's patrol vehicle was parked within a "few hundred yards" from where the Durango had been abandoned, and he knew the vehicle had been stolen and contained drugs and a gun. Deputy Green was "within shouting distance" of other officers within the perimeter, but he was by himself and, in a dangerous situation, he estimated that it would have taken a couple of minutes for another officer to reach him. He saw Plaintiff's SUV, emblazoned with "Alphard

---

[19] Another officer said he saw a "white male" as the driver of the Durango over the radio transmission. (Doc. 26-2). Deputy Green testified that he either did not hear it, or "the information is not always 100 percent, so [he] has to identify everybody that's inside the perimeter." (Doc. 24-3 at 14; *see id.* at 15 (discussing radio description by Deputy Young who Green testified was "the one that almost got hit by the vehicle. And it was like 3:00-something in the morning. It was very hard to distinguish what color of skin.")).

Sound Technology" logos, turn on its headlights as the Durango had done about an hour before and then veer towards Deputy Young.

Plaintiff argues that it was not reasonable for Green to briefly detain Plaintiff or ask him for identification "knowing" that Plaintiff was not the suspect based on the description in the police radio transmission. However, even if Green had heard the transmission and given it full credence, he was not limited solely to searching for the specific "white male" suspect[20] who was driving the Durango; he was also searching for other suspicious third parties who might pick up the suspect to help him get away. The radio transmission indicated deputies could hear the suspect had a cell phone with him. In the potentially volatile situation that Deputy Green faced, it was not unreasonable for him to ask Plaintiff, as the driver of the SUV flashing its lights—who could be waiting to pick up the suspect from the Durango—to identify himself. It is undisputed that Plaintiff was not driving a vehicle that was marked as "security" and that he was not wearing any visible security insignia.

It was also not unreasonable for Green to ask Plaintiff to produce identification. "[I]t is well established that an officer may ask a suspect to identify himself in the course of a *Terry* stop . . . ." *Hiibel,* 542 U.S. at 186-87. By his own admission, Plaintiff cursed at Deputy Green and refused to identify himself, other

---

[20] Deputy Green testified that he had no idea who Plaintiff was – whether he was the actual suspect or someone else. (Doc. 24-3 at 38).

than to say that he was "security for TNT Marine," but without any externally visible evidence that he was actually employed as a security guard or by TNT Marine. According to Plaintiff, the investigatory stop only lasted about a minute before it escalated. Accordingly, it was not a violation of Plaintiff's constitutional rights for Deputy Green to make the investigatory stop or ask Plaintiff to identify himself.[21] Plaintiff also fails to make any argument that Green violated a "clearly established" right relating to the investigatory stop or demand for identification based on relevant caselaw. (*See* Doc. 24).

### 2.  False arrest

Turning to the arrest, Plaintiff alleges that Deputy Green violated his Fourth Amendment and Fourteenth Amendment[22] rights when Green placed him under arrest without probable cause that Plaintiff had committed a crime because Plaintiff was actually "an innocent bystander on private property [who was] working." Doc. 1 ¶¶ 37, 39; Doc. 26 at 10-11. Under the circumstances described above, a reasonable officer in Deputy Green's shoes would have also believed that Plaintiff was resisting

---

[21] To the extent that Plaintiff argues Green violated his constitutional rights by pointing a gun at him during the *Terry* stop, the Court addresses that argument in the excessive force discussion *infra.*

[22] By demonstrating he was arrested without probable cause, a plaintiff can show a violation of the Fourth Amendment, made applicable to the states by the Fourteenth Amendment. *Brown v. City of Huntsville*, 608 F.3d 724, 734 n. 15 (11th Cir. 2010). However, claims for malicious prosecution are analyzed under the Fourth Amendment, not the "more generalized notion of substantive due process" under the Fourteenth Amendment. *See Jordan v. Mosley*, 298 F. App'x 803, 805 (11th Cir. 2008) (citing *Albright v. Oliver*, 510 U.S. 266 (1994)).

without violence. Deputy Green points to the undisputed fact that he approached Plaintiff's vehicle and demanded he identify himself, but—as Plaintiff admits—he cursed at Green, did not exit the vehicle (which was not marked as a security vehicle), and removed his hands from the steering wheel to reach downward. Deputy Green contends that he is entitled to qualified immunity because he had arguable probable cause to arrest Plaintiff for resisting a law enforcement officer without violence pursuant to Florida Statute § 843.02.

Generally, a warrantless arrest without probable cause violates the Constitution and provides a basis for a section 1983 claim, but the existence of probable cause at the time of the arrest constitutes an absolute bar to a § 1983 action for false arrest. *Case v. Eslinger*, 555 F.3d 1317, 1326-27 (11th Cir. 2009). "An arrest is supported by probable cause when it is objectively reasonable based on the totality of the circumstances." *Henry v. City of Mt. Dora*, No. 5:13-cv-528-Oc-30PRL, 2014 WL 5823229, at 11 (M.D. Fla. Nov. 10, 2014), *aff'd*, 2017 WL 2350889 (11th Cir. May 31, 2017). "[P]robable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Illinois v. Gates*, 462 U.S. 213, 244 n.13 (1983). Thus, "innocent behavior will frequently provide the basis for a showing of probable cause." *Id.* "The Constitution does not guarantee that only the guilty will be arrested." *Baker v. McCollan*, 443 U.S. 137, 145 (1979); *see also Pierson v. Ray*, 386 U.S. 547, 555 (1967) ("[A] peace

officer who arrests someone with probable cause is not liable for false arrest simply because the innocence of the suspect is later proved."). In addition, qualified immunity protects officers who reasonably but mistakenly conclude that probable cause is present. *Garczynski v. Bradshaw*, 573 F.3d 1158, 1167 (11th Cir. 2009).

Arguable probable cause exists where an officer "reasonably could have believed that probable cause existed, in light of the information the officer possessed." *Montoute v. Carr,* 114 F.3d 181, 184 (11th Cir. 1997). "Indeed, it is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and in such cases those officials should not be held personally liable." *Von Stein v. Brescher*, 904 F.2d 572, 579 (11th Cir. 1990) (quotation marks and ellipses omitted); *see also Hunter v. Bryant*, 502 U.S. 224, 227 (1991) ("Even law enforcement officials who reasonably but mistakenly conclude that probable cause is present are entitled to immunity."); *Montoute*, 114 F.3d at 184 ("Thus, the qualified immunity standard is broad enough to cover some 'mistaken judgment.'"). The standard is an objective one and does not include an inquiry into the officer's subjective intent or beliefs. *Rushing v. Parker*, 599 F.3d 1263, 1266 (11th Cir. 2010).

"Whether an officer possesses probable cause . . . depends on the elements of the alleged crime and operative fact pattern." *Brown v. City of Huntsville*, 608 F.3d 724, 735 (11th Cir. 2010). An officer's "subjective reason for making the arrest need

not be the criminal offense as to which the known facts provide probable cause" or even "closely related" to the charged offense. *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004); *see also Di Preta v. Taylor*, 675 F. App'x 880, 883 (11th Cir. 2017) (per curiam) (holding facts supported probable cause for an arrest for assault even though the plaintiff had been charged with resisting arrest with violence, battery on law enforcement officer, and a misdemeanor, which had all been nolle prossed). "[T]he fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action." *Devenpeck*, 543 U.S. at 153 (internal quotation and citations omitted).

In this case, the issue is whether a reasonable officer, with the same information known to Deputy Green at the time, would have had arguable probable cause to arrest Plaintiff for *any* offense, "even a very minor criminal offense" committed in the officer's presence. *See Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001) (affirming the custodial arrest of a driver when probable cause existed that she had violated a Texas statute requiring the wearing of seatbelts with a fine as a penalty); *Elmore v. Fulton Cnty. Sch. Dist.*, 605 F. App'x 906, 914 (11th Cir. 2015)("So long as the circumstances known to the officers, viewed objectively, give probable cause to arrest for any crime, the arrest is constitutionally valid even if probable cause was lacking as to some offenses, or even all announced charges.");

*Reid v. Henry Cnty.*, 568 F. App'x 745 (11th Cir. 2014) (per curiam) (holding "[t]he existence of a traffic violation can provide an officer with arguable probable cause to make an arrest, even though the offense is minor or normally punishable by a monetary citation, and even if the officer had no knowledge of that violation at the time").

In this case, Plaintiff admits that he did not comply with Deputy Green's commands to get out of the vehicle, cursed at him instead, and failed to identify himself other than saying he was "security for TNT Marine." Under Florida Law, resisting an officer without violence is a first degree misdemeanor. *See* Fla. Stat. § 843.02. Section 843.02 makes it a crime to "resist, obstruct, or oppose any [law enforcement] officer . . . in the lawful execution of any legal duty, without offering or doing violence to the person of the officer." Fla. Stat. § 843.02. Plaintiff contends that the evidence in the record contradicts Deputy Green's argument that arguable probable cause existed to support the arrest for Plaintiff's failure to comply with Green's commands. Plaintiff argues that Green is not entitled to qualified immunity under § 843.02 because the resistance to arrest must occur while the officer is engaged in the *lawful* execution of a legal duty. He argues that Green was never in lawful execution of a legal duty since he attempted to unlawfully seize Plaintiff from the outset, "even though [Plaintiff] had not committed any crimes in his presence and he did not fit the description of the suspect" for whom Green was looking. (Doc.

26 at 16-17 (citing *Yarusso v. State*, 942 So. 2d 939, 941 (Fla. 2d DCA 2006) and

*Windsor v. Eaves*, 614 F. App'x 406, 411 (11th Cir. 2015)).[23]

"[T]o support a conviction for obstruction without violence, the State must

prove: (1) the officer was engaged in the lawful execution of a legal duty; and (2)

the defendant's action, by his words, conduct, or a combination thereof, constituted

obstruction or resistance of that lawful duty." *C.E.L. v. State*, 24 So. 3d 1181, 1185-

86 (Fla. 2009). To render this provision consistent with the First Amendment's

protection of speech, "Florida courts have generally held, with very limited

exceptions, that physical conduct must accompany offensive words to support a

conviction under § 843.02." *Davis v. Williams*, 451 F.3d 759, 765 (11th Cir. 2006).

One of the "limited exceptions" when the "use of words alone can be a violation of

§ 843.02" is when a suspect does not provide correct information to a police officer

during a valid arrest or *Terry* stop. *See D.G. v. State*, 661 So.2d 75, 76 (Fla. 2d DCA

1995) (footnote omitted); *Rumph v. State*, 544 So.2d 1150 (Fla. 5th DCA 1989)

(giving false name to officer after arrest supported conviction for resisting).

However, this rule "does not obligate a person to give his or her correct identity to

---

[23] The "narrow question" in *Yarusso* was whether a driver's decision to jump in his truck and drive away from a consensual encounter with officers could support a "resisting" charge. 942 So. 2d 939, 941. In *Windsor*, the officers physically removed the driver from the vehicle, forcing him to the ground and restraining him before even asking his name; they also admitted that they lacked probable cause to arrest him when they stopped him. 614 F. App'x at 409. Neither case is apposite to the facts in this case where Deputy Green was patrolling the perimeter during a manhunt in the middle of the night.

an officer unless that person is legally detained." *Caines v. State*, 500 So.2d 728 (Fla. 2d DCA 1987) (citing *Steele v. State*, 537 So.2d 711 (Fla. 5th DCA 1989)). Additionally, where an officer in the course of a lawful traffic stop orders the driver out of the car, and the driver refuses to exit, the driver's refusal "clearly obstructs" the investigation. *Billips v. State*, 777 So. 2d 1094, 1095 (Fla. 3d DCA 2001) (affirming conviction for obstruction of justice of driver whose car fit the BOLO alert, and when stopped, became verbally abusive, repeatedly refusing to exit her car when requested so that officers had to physically remove her from the car).

As discussed at length *supra*, Deputy Green had sufficient reasonable suspicion to justify the brief investigatory detention of Plaintiff; therefore, the first element of the resisting statute is met. A reasonable officer would have had arguable probable cause to believe that Plaintiff was resisting without violence based on Plaintiff's perceived refusal to get out of the vehicle (even though based on the problems with his knee), his moving around inside the vehicle (while trying to lift his knee over the console), and his refusal to provide any identification other than Plaintiff's response that "I am f'ing security on duty for TNT Marine" without any visible security insignia. "Knowing defiance of a lawful *Terry* stop constitutes unlawful resistance without violence." *C.E.L. v. State*, 995 So.2d 558, 561 (Fla. 2d DCA 2008) (en banc), *approved*, 24 So.3d 1181 (Fla. 2009); *see also Barfield v. Rambosk*, 641 F. App'x 845, 848 (11th Cir. 2015) (per curiam) (affirming summary

judgment that officer had arguable probable cause to arrest for resisting without violence a driver sitting in a parked car with the engine running for three hours who was detained for investigation when he appeared "under the influence" in actively resisting handcuffs and never communicated his medical problem).

### 3. **Malicious Prosecution**

Plaintiff also alleges that Deputy Green violated his Fourth Amendment right by "maliciously initiat[ing] the criminal proceedings against Plaintiff in order to justify the arrest of Plaintiff and bolster the false allegations contained in an official report." (Doc. 1 (Count III)). Deputy Green contends that he is entitled to qualified immunity on Plaintiff's § 1983 malicious prosecution claim because there was arguable probable cause for the arrest. Plaintiff argues that it was not reasonable for Deputy Green to believe there was probable cause for an arrest when Plaintiff had not committed any crimes or broken any laws in Green's presence and Plaintiff had not obstructed or resisted a law enforcement officer without violence. (Doc. 26 at 14-16 (citing *Windsor v. Eaves*, 614 F. App'x 406, 411 (11th Cir. 2015)).

The Eleventh Circuit "has identified malicious prosecution as a violation of the Fourth Amendment and a viable constitutional tort cognizable under § 1983." *Kjellsen v. Mills*, 517 F.3d 1232, 1236 (11th Cir. 2008), *abrogated on other grounds by Williams v. Aguirre*, 965 F.3d 1147, 1162–65 (11th Cir. 2020). A Fourth Amendment malicious prosecution claim under § 1983 remains a federal

constitutional claim, and its elements and whether they are met ultimately are controlled by federal law. *Kjellsen,* 517 F.3d at 1236 (citing *Wood v. Kesler,* 323 F.3d 872, 882 (11th Cir. 2003)). To prove a § 1983 malicious prosecution claim, under federal law, a plaintiff must show the following: "(1) a criminal prosecution instituted or continued by the present defendant; (2) with malice and without probable cause; (3) that terminated in the plaintiff accused's favor; and (4) caused damage to the plaintiff-accused." *Id.* at 1236 (quoting *Wood*, 323 F.3d at 881-82). "Because lack of probable cause is a required element to prove a §1983 claim for malicious prosecution in violation of the Constitution, the existence of probable cause defeats the claim." *Id.* at 1237; *Grider v. City of Auburn*, 618 F.3d 1240, 1256-57 (11th Cir. 2010) (same).

As the Court discussed at length *supra*, Deputy Green had arguable probable cause to arrest Plaintiff for resisting without violence. Therefore, Deputy Green is entitled to qualified immunity on Plaintiff's malicious prosecution claim. *See Wood*, 323 F.3d at 881-82 (holding trooper was entitled to qualified immunity on driver's § 1983 malicious prosecution claim where trooper had actual probable cause to issue the reckless driving citation and for the custodial arrest); *Zargari v. United States*, 658 F. App'x 501, 506 (11th Cir. 2016) (affirming summary judgment for officer where the undisputed evidence demonstrated that there was probable cause for arrestee's prosecution on fraud claim under the totality of the circumstances) (citing

*Alamo Rent-A-Car v. Mancusi*, 632 So.2d 1352, 1355 (Fla. 1994)). Because the Court has determined that arguable probable cause existed for Plaintiff's arrest, Plaintiff's claim for malicious prosecution fails, there is no constitutional violation, and Deputy Green is entitled to qualified immunity on the claim.

### 4. Plaintiff fails to cite "clearly established" law

Even if Plaintiff had shown that Deputy Green's conduct violated a constitutional right for false arrest or malicious prosecution because of a lack of arguable probable cause, Plaintiff has failed to point to facts supporting a conclusion that his arrest by Deputy Green violated any "clearly established" constitutional right at the time of the violation. It is Plaintiff's burden to demonstrate that the defendant violated a constitutional right that was clearly established at the time. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001).[24] For purposes of this analysis, the critical question is whether the state of the law gave the government actor "fair warning" that his alleged treatment of the plaintiff was unconstitutional. *Vinyard*, 311 F.3d at 1350. Plaintiff argues rather generically that it is "clearly established that citizens have a right under the Fourth Amendment to be free from arrest without probable cause" and that Green was "never in lawful execution of a legal duty." (Doc. 26 at 13, 16 (citing *Baker v. McCollan*, 443 U.S. 137, 142 (1979)).

---

[24] The two-part inquiry from *Saucier* may still be applied when that "order of decision-making will best facilitate the fair and efficient disposition of [the] case." *Case v. Eslinger*, 555 F.3d 1317, 1326 (11th Cir. 2009) (citing *Pearson*, 555 U.S. at 223).

Deputy Green argues that Plaintiff has pointed to no controlling authority with materially similar facts that would have been sufficient to put Green on notice that his actions were unconstitutional; instead, Plaintiff has pointed to many cases that are not from within the Eleven Circuit. (Doc. 27 at 5 (citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)).

"The usual way of establishing that a constitutional violation was clearly established law is by pointing to a case, in existence at the time, in which the Supreme Court or this Court found a violation based on materially similar facts." *Cantu v. City of Dothan*, 974 F.3d 1217, 1232 (11th Cir. 2020); *McClish v. Nugent*, 483 F.3d 1231, 1237 (11th Cir. 2007) (looking to binding decisions of the Supreme Court of the United States, the Eleventh Circuit, and the Florida Supreme Court to determine whether a right was "clearly established"). Based on these decisions, the Court must determine "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202.

In his argument on arguable probable cause for the arrest, Plaintiff cites cases from the Second, Eighth, and Tenth Circuits. (Doc. 26 at 13-15). Plaintiff's Response contains a section entitled, "[i]t was clearly established that Plaintiff's Resistance *and Flight*[25] During an Unlawful Stop would not give rise to Arguable Probable Cause for his Arrest." (*Id.* at 16-17). Plaintiff cites a single case, and that

_____

[25] There is no allegation of "flight" by Plaintiff in this case.

case is not from the Florida Supreme Court, but a Florida District Court of Appeal.[26]

"In this circuit, the law can be 'clearly established' for qualified immunity purposes only by decisions of the U.S. Supreme Court, Eleventh Circuit Court of Appeals, or the highest court of the state where the case arose." *Jenkins by Hall v. Talladega City Bd. of Educ.*, 115 F.3d 821, 826 n.4 (11th Cir. 1997) (en banc). Thus, Plaintiff has failed to show that the proposed constitutional violation was clearly established by pointing to a case with "indistinguishable facts"; he has failed, alternatively, to articulate "a broad statement of principle" or argue the conduct was "so egregious that a constitutional right was clearly violated, even in the total absence of case law." *See Lewis v. City of W. Palm Beach*, 561 F.3d 1288, 1291-92 (11th Cir. 2009). In this case, Plaintiff has not demonstrated that Deputy Green would have had fair warning that arresting Plaintiff or initiating prosecution was unlawful based on "clearly established" law.

### E. *Excessive Force claim*

Once summary judgment is granted in Deputy Green's favor on the unreasonable seizure and false arrest claims, Plaintiff's excessive force claim must be analyzed independently. *See Lee v. Ferraro*, 284 F.3d 1188, 1197 (11th Cir. 2002). "The Fourth Amendment's freedom from unreasonable searches and seizures

---

[26] *Yarusso v. State*, 942 So. 2d 939, 941 (Fla. 2d DCA 2006). Moreover, the case is inapposite because there was no *Terry* stop and the driver was free to leave the "consensual" encounter at the car lot with officers who had no right to detain him.

encompasses the plain right to be free from the use of excessive force in the course of an arrest." *Lee*, 284 F.3d at 1197 (citing *Graham v. Connor*, 490 U.S. 386, 394-95 (1989)); *Crosby v. Monroe*, 394 F.3d 1328, 1332 (11th Cir. 2004).

Deputy Green argues that he is entitled to summary judgment on Plaintiff's excessive force claim because there was no indication that Plaintiff posed a threat to Deputy Green when Green approached Plaintiff's SUV with his firearm drawn and the threat of deadly force. (Doc. 26 at 12-13). Plaintiff also argues that Deputy Green's use of the taser on him and Green's jerking him out of the SUV, throwing him on the ground, and kneeling on his back were not reasonably proportionate uses of force when Plaintiff was merely doing his job as a security officer. (*Id.* at 13 (citing *Thornton v. City of Macon*, 132 F.3d 1395 (11th Cir. 1998)). Plaintiff argues that none of Deputy Green's actions were justified or necessary in this case.[27]

The Court must first determine whether Plaintiff's version of the facts demonstrates that in the course of arresting Plaintiff, Deputy Green subjected him to an unlawful use of force. In particular, the Court must evaluate whether Green used excessive force when: 1) approaching Plaintiff's vehicle with his gun drawn; 2) tased him during the course of Plaintiff's arrest; and 3) in pulling Plaintiff out of the

---

[27] To the extent Plaintiff argues that Deputy Green did not have the right to use any force since he did not have the right to make the arrest, the Court need not address this argument further given the finding above that Green had arguable probable cause for the arrest.

vehicle. The Court considers "whether the officer's conduct is objectively reasonable in light of the facts confronting the officer." *Vinyard*, 311 F.3d at 1347.

The Supreme Court's "Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham*, 490 U.S. at 396–97. "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* at 396 (quotation omitted); *Lee*, 284 F.3d at 1197.

Proper application of the test of reasonableness under the Fourth Amendment requires "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* The Court explained:

> The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. . . .With respect to a claim of excessive force, the same standard of reasonableness at the moment applies: Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.

*Graham*, 490 U.S. at 396–97 (internal citations and quotations omitted). *See also Charles v. Johnson*, 18 F.4th 686, 699 (11th Cir. 2021) ("In determining the reasonableness of the force applied, we look at the fact pattern from the perspective of a reasonable officer on the scene with knowledge of the attendant circumstances and facts and balance the risk of bodily harm to the suspect against the gravity of the threat the officer sought to eliminate.").

### 1. Drawing gun during investigatory stop

Plaintiff argues that it was not reasonable for Deputy Green to point his gun at Plaintiff because Green allegedly knew that Plaintiff was not the suspect from the Durango or, possibly, that the suspect had not yet been identified.[28]  He contends that "the encounter between Green and Alli was never a '*Terry* Stop,' [rather,] it was an unconstitutional seizure from the onset" because Deputy Green had his gun drawn. (Doc. 26 at 12).[29]  Plaintiff argues that Deputy Green should have never approached Plaintiff at gunpoint, because arguable probable cause was lacking since Plaintiff had not broken any laws in Green's presence.

---

[28]  Plaintiff argues that Green's actions did not "make any sense other than he was angry" or "on edge because of the recent marital issues." (Doc. 26 at 12). Green's motivation for the stop and arrest is irrelevant. The Court must assess an officer's actions from the perspective of a "reasonable officer." *See Rushing v. Parker*, 599 F.3d 1263, 1266 (11th Cir. 2010) (noting that the standard is "objective" and does not inquire into the officer's subjective intent or beliefs).

[29]  Plaintiff relies on *Jackson v. Sauls*, 206 F.3d 1156, 1166 (11th Cir. 2000). However, the panel found in *Jackson* that if the investigative stop was legal then the officers' threat of force in drawing weapons was not excessive force. *Id.*

The Eleventh Circuit has held that, for "the sole officer awaiting assistance and holding a gun" on people in a vehicle during an investigative stop, "the better view is that the use of guns in connection with a stop is permissible where the police reasonably believe they are necessary for their protection." *Courson v. McMillian*, 939 F.2d 1479, 1494–95 (11th Cir. 1991) (citation and internal quotation marks omitted). "Clearly, this circuit condoned officers having drawn weapons when approaching and holding individuals for an investigatory stop . . . when reasonably necessary for protecting an officer or maintaining order." *Id*. (citing *United States v. Nargi*, 732 F.2d 1102, 1106 (2d Cir. 1984) ("There is no hard and fast rule concerning the display of weapons in investigative stops." (internal quotation omitted)).

The Eleventh Circuit held that an officer's drawing of a firearm was not an excessive use of force in *Courson*, 939 F.2d at 1496, where he was alone late at night at a vacant construction site and had stopped a vehicle containing several occupants, who appeared uncooperative when they did not all exit the vehicle until the officer repeated his command; they also appeared intoxicated and potentially connected with nearby marijuana fields. *Id*. Significantly, as the officer approached the vehicle's occupants, he could not have known if they were armed. *Id*. The court noted that "[i]n the middle of the night, it is not unusual for a law enforcement officer to have his weapon drawn, when approaching individuals suspected" of a crime. *Id*.

In this case, Deputy Green was patrolling the perimeter of an area where a manhunt was being conducted for a suspect believed to be potentially armed who had stolen the Durango; it was the middle of the night and Deputy Green was alone in his vehicle and "minutes" away from other officers. He also saw Plaintiff's vehicle flash its lights to signal someone (unbeknownst to Green, who did not normally patrol that area, Plaintiff was signaling him). As Deputy Green points out in this case, Plaintiff's vehicle was not marked as security, he did not have any security insignia visible on his person, and Deputy Green had no way of knowing if the person inside the vehicle was the Durango suspect stealing another car, or another person attempting to aid the suspect. (Doc. 27 at 2). Accordingly, it was not unreasonable for Green to approach Plaintiff's vehicle with his gun drawn.

### 2. Using the taser on Plaintiff

Plaintiff argues that Deputy Green's use of a taser on him was excessive because he was trying to comply with Green's commands to show identification and retrieve his security badge at the point when Green tased him. Deputy Green argues that his use of a taser to effectuate Plaintiff's arrest was reasonably proportionate to the "difficult, tense and uncertain situation" that Deputy Green faced: although Plaintiff was aware that there was unusual, urgent law enforcement activity, he flashed his lights at Deputy Green, did not get out of his vehicle, cursed back at Deputy Green, and did not provide identification. (Doc. 24 at 17-18).

Important to the determination of whether any force used by an officer was excessive is the question of whether the arrestee complied with the officer's commands, or whether the arrestee resisted the officer's attempts to effectuate the arrest. *See Charles*, 18 F.4th at 700 (officer's routine takedown to pavement was reasonable where plaintiff was resisting and acting erratically). "[I]n determining if force was reasonable, courts must examine (1) the need for the application of force, (2) the relationship between the need and amount of force used, and (3) the extent of the injury inflicted." *Lee*, 284 F.3d at 1198 (citation omitted); *see also Vinyard*, 311 F.3d at 1347.

The Eleventh Circuit's opinion in *Draper v. Reynolds*, 369 F.3d 1270 (11th Cir. 2004) is on point. In *Draper*, a deputy made a traffic stop for a defective taillight on a tractor trailer and twice shined a flashlight into the cab of the truck. *Id*. at 1272. The driver complained and the deputy asked him to get out of the truck and walk to the back, in sight of the patrol vehicle's dashcam. *Id.* When the deputy asked the driver for his license, the driver used profanity and was "belligerent, gestured animatedly, continuously paced, appeared very excited, and spoke loudly." *Id*. at 1273. When asked for his log book and other documentation, the driver repeatedly walked toward the cab, turned back to the deputy, and accused him of harassment while the driver became more agitated; the deputy eventually used his taser on him. *Id.* at 1273-74. "By repeatedly refusing to comply with [the deputy's] reasonable

instructions, and by acting belligerently and confrontationally, [the driver] hindered [the deputy] in completing the traffic stop," thus, "[the deputy] had ample probable cause to arrest [the driver] for violating" Georgia law which made it "unlawful to knowingly and willfully obstruct or hinder any law enforcement officer in the lawful discharge of his official duties." *Id.* at 1277.

The Eleventh Circuit found in *Draper* that the deputy's use of the taser to effectuate the arrest of the driver was "reasonably proportionate to the difficult, tense and uncertain situation that the deputy faced in the traffic stop and did not constitute excessive force." *Id.* at 1278. The driver had repeatedly refused to comply with the deputy's verbal commands, and the amount of force used—a single use of the taser—was reasonably proportionate to the need for force and did not inflict any serious injury. *Id.* Thus, under the "totality of the circumstances," the use of the taser did not constitute excessive force, and the deputy did not violate the driver's constitutional rights in the arrest. *Id.* In *Barfield v. Rambosk*, 641 F. App'x 845 (11th Cir. 2015), a driver who was detained for investigation appeared "under the influence," but never communicated his medical problem, and was arrested for resisting without violence when he tried to get back in his car and actively resisted handcuffs. *Id.* at 848. He was tased when he reached towards his waistband, which the officer feared might have indicated the plaintiff was reaching for a weapon. *Id.* at 847-48; *Floyd v. Corder*, 426 F. App'x 790, 792 (11th Cir. 2011) (affirming

summary judgment for deputy who used taser on noncompliant suspect where arrestee had been yelling, hit deputy's hand away, and refused to comply with his orders).

In this case, Deputy Green did not violate Plaintiff's rights given that Plaintiff, by his own account, when asked for his identification and to exit his vehicle, profanely yelled at Green he was "f'ing security" and "on duty for TNT Marine" and Plaintiff appeared resistant to getting out of the vehicle (since Green was unaware of Plaintiff's knee problem) and to providing identification. Once Deputy Green reached the driver's side window and holstered his gun, Plaintiff—without waiting for the okay from Deputy Green—admits that he moved his hands from the steering wheel downward to retrieve his security badge from under his hoodie. Deputy Green's use of the taser a single time on Plaintiff when he reached downward for his security badge—without approval from Deputy Green—was not an excessive use of force.

### 3. Pulling Plaintiff from vehicle onto the ground

Because Deputy Green was arresting Plaintiff, the use of some force was warranted. *See Brown v. City of Huntsville*, 608 F.3d 738, 739-40 (11th Cir. 2010) ("[T]he law permits some use of force in any arrest."). "A law enforcement officer's right to arrest necessarily carries with it the ability to use some force in making the arrest." *Id*. at 740. "[S]ome use of force by a police officer when making a custodial

arrest is necessary and altogether lawful, regardless of the severity of the alleged offense." *Durruthy v. Pastor*, 351 F.3d 1080, 1094 (11th Cir. 2003) (finding no excessive force where the officer grabbed the plaintiff from behind, and pulled him onto the ground, while struggling to pin his arms behind him and handcuff him).

Even for "minor offenses, permissible force includes physical restraint, use of handcuffs, and pushing into walls." *Brown*, 608 F.3d at 740. Moreover, the Eleventh Circuit has found that an officer's use of de minimis force to effectuate a lawful arrest does not constitute excessive force. *Taylor v. Taylor*, 649 F. App'x 737, 746-47 (11th Cir. 2016) (deputy's use of force during arrest was not excessive where he grabbed arrestee, slammed her into the side of the patrol car, and handcuffed her, fracturing her hand and forearm); *Woodruff v. City of Trussville*, 434 F. App'x 852, 855 (11th Cir. 2011) (officers were entitled to qualified immunity on excessive use of force where officer forcefully removed plaintiff from car and threw him to the pavement, causing him to strike his head); *Nolin v. Isbell*, 207 F.3d 1253, 1257 (11th Cir. 2000) (holding officer was entitled to qualified immunity where officer grabbed arrestee from behind by the shoulder and wrist, threw him against a van several feet away, kneed him in the back and pushed his head into side of van, and handcuffed him causing bruises); *Ainsworth v. City of Tampa*, No. 8:10-cv-293-T-23TGW, 2010 WL 2220247, at *5 (M.D. Fla. June 2, 2010) (granting qualified immunity to officer where plaintiff repeatedly refused to comply with officer's directions to exit his

vehicle because he denied that he was the individual named in an outstanding warrant, and officer reached in, grabbed him, and "yanked him violently from the vehicle before slamming [his] body into the ground" causing herniated discs necessitating two surgeries). Considering the totality of the circumstances in this case, Deputy Green removed Plaintiff from the vehicle after his repeated non-compliance with Green's commands to exit the vehicle and after Plaintiff had reached down toward his waist. Deputy Green's pulling Plaintiff from the SUV and pushing him to the ground fail in order handcuff him does not establish a constitutional violation.

### 4. "Clearly established" law of excessive force

Even if Plaintiff had shown that Deputy Green's conduct violated a constitutional right for excessive force, Plaintiff has failed to point to facts supporting the conclusion that Deputy Green's use of force violated any "clearly established" law on point at the time of the violation. As set forth above, Plaintiff has the burden to demonstrate that the defendant violated a constitutional right that was clearly established at the time. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001). Based on these decisions, the Court must determine "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 202.

Plaintiff argues, again in a rather general sense, that it was clearly established

that "an officer should only use force that is commensurate to the alleged act of the suspect. Using injurious force on a suspect who does not pose a threat of bodily harm to the officers or anyone else at the time of arrest and who is not attempting to flee or resist arrest is conduct so egregious that a constitutional right is clearly violated." (Doc. 26 at 12 (citing *Priester v. City of Riviera Beach*, 208 F.3d 919, 927 (11th Cir. 2000) (affirming denial of qualified immunity for excessive force where police dog bit burglary suspect) and *Marantes v. Miami-Dade County*, 649 F. App'x 665, 671-72 (11th Cir. 2016) (affirming denial of qualified immunity where officer allegedly kicked restrained arrestee four times). Plaintiff contends that he posed no threat to Deputy Green when Green approached Plaintiff with his firearm with the threat of deadly force, and the "single taser discharge" was excessive for "someone that is just doing their job as a security officer." (*Id*.). He also argues that Deputy Green "grabb[ing] and throw[ing]" him "out of his SUV onto the ground" and putting his knee on Plaintiff's back was not "reasonably proportionate force" used on a person like Plaintiff who has not committed any crimes and was working as a security guard on private property. (*Id*. (citing *Thornton v. City of Macon*, 132 F.3d 1395, 1399 (11th Cir. 1998) (denying qualified immunity where officer arrested roommate for not exchanging mattress for car keys to resolve tenant dispute) and *Hazleton v. Trinidad*, 488 F. App'x 349, 353 (11th Cir. 2012) (officers not entitled to qualified immunity for minor physical force and pepper spray used in warrantless arrest of

plaintiff in her home where exigent circumstances did not exist)).

In this case, while Plaintiff has cited excessive force cases that denying qualified immunity, he has not demonstrated that Deputy Green would have had fair warning that drawing his gun during the investigatory stop of Plaintiff, using his taser when Plaintiff moved his hands downward toward his waist, or pulling Plaintiff from his vehicle to arrest him were unlawful because Plaintiff's cited cases are significantly different on the facts. Plaintiff's cited cases involve police-dog bites, a roommate civil dispute, an intrusion in the home, or injuries to an arrestee in restraints. Plaintiff has not cited or presented any cases materially similar to the facts of his case involving a manhunt for an evasive suspect where a driver failed to comply with an officer's commands to exit the vehicle and, instead, cursed at the officer. To the contrary, as discussed, the facts of this case are similar to those in decisions from the Eleventh Circuit where the defendants' actions were found not to violate the Constitution.

## CONCLUSION

For the reasons explained above, to the extent Deputy Green seeks summary judgment on Plaintiff's claim that Green unreasonably seized him, falsely arrested him, maliciously prosecuted him, or used excessive force in arresting him, Deputy Green is entitled to qualified immunity.

Based on the foregoing, it is ordered as follows:

1.     Defendant Robert Green's Motion for Summary Judgment (Doc. 24) is

**GRANTED.**

2.     The Clerk is **DIRECTED** to enter judgment that Plaintiff Mahamoud

Alli take nothing on his claims, and Defendant Robert Green is entitled to costs.

3.     All pending motions are denied as moot. The Clerk is **DIRECTED** to

close the case.

**DONE** and **ORDERED** in Chambers, in Orlando, Florida on August 18,

2022.

ANNE C. CONWAY
United States District Judge

Copies furnished to:
Counsel of Record